We'll proceed to hear the next matters on our calendar this morning, United States v. Mickens. We have three separate arguments, three separate appellants, Mr. McGuire, then Mr. Donovan, then Ms. Barber, and then we'll hear from the government. Mr. McGuire, you're appearing for Mr. Mickens, is that right? That's correct. Okay, please proceed. Thank you. Good morning. James McGuire for John Mickens. I want to focus this morning on two of the legal issues raised in our briefing. The district court's sua sponte restriction of the defense closing argument and the government's failure to preserve and disclose Brady material. I think it makes sense, though, to begin by at least noting this really wasn't a straightforward government case. This was a cold case. And I think the heart of a cold case is the reality that cases run cold when there aren't clear answers. So this is a prosecution brought eight years after the events at issue. And in this prosecution, the government essentially relied on two pillars to try to convince the jury. They pointed first to law enforcement efforts to reconstruct events over the course of these eight years. And also critically on the testimony of a single prime government witness. Now, the problem, the shakiness of these two pillars is really set forth in the briefing with respect to the sufficiency argument, which is sort of, I think, a bit sprawling to focus on here. But I also think it's important that these two pillars are also critical to the legal issues that came up in this case, particularly these issues I want to discuss. And really, I think it's improper legal decisions by the district court prevented the defense from effectively and sufficiently highlighting the problems here with the government's case. So beginning with the end, with the closing arguments in which the district court, again, sua sponte, cut off the defense argument with respect to the inadequacy of the government investigation, particularly into third parties. I think the heart of what the district judge said, and this is again at sidebar, is that you can't condemn the government on the basis of a supposedly inadequate investigation about someone who is not on trial here. And quite simply, that is wrong. It is flatly inconsistent with the law as recognized in cases, notably Kyle's v. Whitley and Alvarez v. Ecole. Notably, these aren't cases, either Whitley or Alvarez, that sort of recognize a right or point to a new right. I think that it's clear that from these cases, this is a common accepted defense tactic that these cases acknowledged to be routine and appropriate. And in fact, the restriction on the ability to raise these arguments was sufficient to grant habeas release. I don't think the government, and certainly they'll have a chance to respond, I don't think the government offers much of a defense of… Well, if we agree that it should have been permitted to continue, the jury heard the evidence, and you did a good job in your reply brief of sort of pointing to things in the record that were referenced to the Jamaicans. But all that came out during the trial. The jury heard it. And in fact, the argument was made in the summation. The judge didn't strike the argument. It stopped it from proceeding. But I'm not sure what more would have been said beyond that the evidence was in about a Jamaican accent and potentially robbing Jamaicans earlier. And the lawyer said it could have been a Jamaican. And then there was a sidebar, so the jury didn't hear the conversation that you're describing between the judge and the attorney. So what would be the… Why would we think the outcome would be different in the trial if there had been more discussion? Sure. So I think the first thing to say is that this was a lengthy trial in which there was not an affirmative defense case. And in which the government, over the course of a significant period of time, presented essentially the chronology of this case. And because there isn't an affirmative defense obligation to put on their own case, it's through summation that we have an opportunity to point the jury to particular moments. And particularly moments that were not followed up on. So the issues involving not only Jamaicans, but also there's a… And this wasn't highlighted in the brief. But Attorney Reeve did also make a brief proffer that he would have gotten into the question of Desmond Wright's involvement. This was the close friend of the victim. The judge allowed… And there was significant discussion about the government's investigation and the sloppiness and the things that they could have done. And the judge was pretty clear at sidebar, that's all fair game. It was only in terms of referencing the Jamaicans. So, you know, it didn't limit the ability to question the government's investigation. I think that it did. And I think importantly in a case in which what we're talking about is the government reconstruction of events from years earlier. The government wants and did claim to have correctly picked out the story. They correctly picked out the right set of facts. And what the defense attempted to point to was that the government story was not only incomplete, but that it didn't include aspects of the record. That it didn't follow up on other possibilities for which there was factual indication. And so the government story was a partial one and one that didn't incorporate all of the essentially pieces of the factual record. And so it was very important for the defense to be able to point to those defects. And because of the judge's ruling, we were not able to do so. Oh, thank you. You've reserved two minutes for rebuttal. Thank you. Okay. We'll hear from Mr. Donovan, please. Madam Clerk. May it please the Court? Can you hear me?  Thank you, Your Honor. My name is Jeremiah Donovan. Let me, sorry, I should, this will shock you, actually. I tried the case below with Justin Smith. Justin was appointed. Excuse me, just a minute. Oh, my goodness. I'll explain that in a sec. Please go ahead. Justin Smith was, I tried this case with Justin Smith. Justin was appointed to represent the defendant on appeal, but he's left to become a public defender in the state. So I've been reappointed to argue this appeal, which just goes to show that appeals sound like baseball games. You can get out of the game and then come back in again later. One of the great pleasures of my professional life is coming to that beautiful courtroom in New York and arguing cases. For those of us who do criminal law, it's a good reminder that we're members of a learned profession. But these distant arguments are good because I could not do this if it weren't a distant argument. I had a detached retina that was reattached on Tuesday. I have to lie face down on a couch for seven days, which is what I'm doing right now, and arguing to a computer on the floor. I hope that Learned Hand and Henry Friendly aren't spinning on their pedestals. Justin, begin. Please proceed. I'm sorry that you're in this circumstance, but thank you for proceeding. It's just too important a case to rely on the papers. Justin began our briefs by arguing a sufficiency of the evidence. That's a tough road to hoe, but it's a really good place to start because it gives color and meaning to those claims of prosecutorial misconduct, which he makes later. The evidence against our fellow consisted of really three things. A witness, an informant, a cooperating witness, who had previously accused an innocent man of committing this murder, who gave a description of the way the murder took place that was impossible to have taken place, given the forensic evidence, and whose testimony was at odds with much of the rest of the testimony at trial. This, it seems to me, gives ... I should say also this. Our guy's DNA was found in the car, but it was found in a place where the cooperating witness had never said he had sat. In addition, there was an innocent explanation, well, semi-innocent explanation, for why that DNA was there. The car was used by the dead man as a place to sell drugs and his girlfriend. Let me just ask you, and I'm inspired by your dedication to not seek an adjournment and to go forward here today. I want to compliment you on that. But the standard is incredible. In order for your evidence not to be sufficient, we would have to conclude, over the view of the district court judge who heard the testimony and the 12 jurors who heard the testimony, that Mr. Ashanti is incredible as a matter of law, right? That's what we have to do. It is a high standard. You would have to find that what he said was impossible to have happened. I don't think we've ever said that in a criminal case. I don't think any circuit actually has ever said that, because the standard is so high. What is incredible as a matter of law, obviously, he falsely implicated someone into inconsistencies, but none of those things are novel to criminal trials. But he also says, Petitie also says, the way that they murdered him is they stabbed him in the head with a knife, that they scourged at his eye, that they... No, he was in another car, right? No, no, those things happened while he was in the car. There could be some aspect of someone's testimony that defies... Someone could say it was a 9mm, and it turns out not to be a 9mm from the ballistics. That doesn't mean they're incredible as a matter of law. It has to be that the overall story is so incredible as a matter of law, they can't be believed, right? And I think we've reached that standard here, but I recognize it's a really high standard, and I think what I want to do, if it's okay with your honor, is to jump over to the prosecutorial misconduct, because that, it seems to me, given the evidence in the case, is what's really important. And what I'd ask you to do, Judge Bianco, and the other judges, is try to put yourself in the position of a jury at a crucial stage of the proceedings, where maybe half the jurors think there's reasonable doubt and half don't. And I get up as a juror and I say, look, it's very clear that these guys were bad guys, that they were robbers. The prosecution introduced evidence that, you know, when they said, come down to the place, he immediately knew it was going to be a robbery. They introduced evidence that Mickens had said that whenever he did a robbery, he used a Jamaican accent. And what was it the prosecutor said? He said, we've got four guys here, three of them on trial, one of them isn't on trial. If they didn't do this, wouldn't one of them have presented an alibi? I mean, where's the alibi? The prosecutor said, you know, these guys don't present any alibi. Come on. And what about, you know, this Agent James? Now, I know that Ashanti seems not very credible, but this Agent James, this FBI agent, he's a decent guy. He's sworn to enforce the law, and he's vouched for Ashanti. And he's vouched for this, you know, they claim Desmond must have had something to do with it. You know, James says that he believes Desmond's explanation. And what about, you know, all the prosecutors saying, oh, there's no evidence of this, there's no evidence of that. But, you know, the prosecutors told us about how the defense had kept the evidence out. That's what these defense attorneys do. They keep the evidence out. Just think of all the evidence that might have come in if the defense hadn't prevented it. So if you place yourself in the position of the jurors, who heed, you know, who give great weight to the prosecution, and who heed what they say, you can see just how prejudicial all this stuff was. So I have two minutes, and I'll be back to you. But can I just interpose here? James didn't comment directly on Ashanti's testimony, credibility, or truthfulness. At most, he corroborated on an objective fact that Ashanti had asserted in his testimony. So he was not vouching for Ashanti's truthfulness or credibility, was he? Well, it was probably not quite as broad as I made the jurors say. But what he said was that when Ashanti told us certain things about the Hartford dispatcher, I had already verified that all of that was true. I knew about that all in advance. And so he vouched for an important part of Ashanti's testimony. Based on his independent investigation? Well, yeah, that's another issue. Maybe I'll get to that on rebuttal. Based on what the Hartford police had told him, right. Please take your time to respond to Judge Garifuss's question. I'm sorry, say that again? Feel free to take your time to respond to Judge Garifuss's question, okay? Thank you, Your Honor. I think I've responded as well as I can, Judge. All right. Thank you. Very good. You have reserved those two minutes for rebuttal. Thank you, ma'am. We'll go to Ms. Barber, please. Good morning, Your Honors. May it please the Court, my name is Erica Barber. I represent the defendant appellant, Mr. Harold Cook. The principal issue in this case that I wish to focus on this morning is whether jurors deciding the question of Mr. Cook's guilt had a fair opportunity to assess the government's evidence and reach a reliable determination, notwithstanding the fact that his trial was infected with what we maintain are serious improprieties in the government's opening and rebuttal arguments. I want to start with the centerpiece of Mr. Cook's defense in this case, which was that Jesus Ashanti, a paid police informant and habitual liar, falsely implicated him in this case to obtain a benefit in connection with his anticipated exposure in a series of bank robberies in Massachusetts. The proof at trial, or the lack of proof at trial, strongly corroborated Mr. Cook's claim of innocence. There was no independent witness linking Mr. Cook to this incident. There was no DNA evidence to corroborate his involvement. Mr. Cook's DNA profile was eliminated as contributing to every DNA profile against which it was compared in this investigation, which spanned, as you know, several years. Finally, there was no cell site location information placing Mr. Cook at the scene. To bolster the government's case, Attorney Durham engaged in deliberate... Before you point out, though, there were call records, right, that showed Mr. Lee, called Mr. Teasley, and then immediately made five calls from Lee to your client. Excuse me, before you respond, I'm sorry, Judge Bianco, could the clerk please start running the clock? Thank you. Ms. Barber, you've got extra time. Thank you. To respond to that, yes, there were a series of phone calls. 938, there was a call between Lee and Mr. Teasley, and subsequent to that, there were phone calls exchanged between Lee's phone and Mr. Cook's phone, or a phone that was associated with Mr. Cook. However, there was also testimony that this type of phone, which had no subscriber information, was consistent with a drug phone. And significantly, the phone was in use for a month following this homicide, contrasted to Mr. Ashanti's phone, which shut off that evening, I believe. So returning to the argument, to bolster the government's case, Attorney Durham engaged in deliberate and repeated misconduct. He commented on the lack of alibi evidence presented to contradict Ashanti's claim, while vouching for the credibility of his chief witness. Mr. Donovan referenced that too. It was a more general reference. I understand the point that you're making, but the point he was trying to make was that it was very risky for a cooperating witness to go into law enforcement and implicate multiple people, give all these details, because it could turn out to be wrong. If you give all these details, there's a decent chance that ballistics or an alibi or something like that is going to come up that would show that you're lying. I think that was the point. And I think in the rebuttal, he even clarified that I'm not shifting the burden. So isn't it permissible to say it's risky to give all these details? Because you could turn out to be wrong about them. Trying to show Mr. Ashanti's state of mind that he wouldn't have lied under those circumstances. Isn't that a permissible argument? A permissible argument, Your Honor, is to point to the evidence in the case that verifies Mr. Ashanti's claims to suggest that his testimony is credible. You can't say that his state of mind would not be, if he was going to lie and falsely implicate people, he wouldn't have done so in such an elaborate fashion because that's so risky. You're saying that's not a permissible argument? It's not a permissible argument because it relies on the premise that there was no alibi evidence. I didn't refer to alibi evidence. I just said in general to do something like that. I didn't say anything about alibi. But he didn't say it in general. He specifically referred to alibi evidence. He said that it's risky because it's risky because ballistics won't match up. You could say, if you give the detail what the gun is and the ballistics turn out to be different, you'd be, you know, done. It would have been okay to do that? You just picked the wrong thing? It would be because there was evidence in the case as to ballistics, but what he said was it was risky because the defendants could present evidence of alibi, specifically something incontrovertible, that they were out of state, at a hospital, a solid alibi where it could be readily proven that they were on the night of the homicide. And what I would suggest is you can't do indirectly what you can't do directly. There is no mistaking what these comments meant. And there is no mistaking that they shifted the burden of proof to the defendants. And I think what's more troubling about it is it suggests, particularly in the context in which the statements were made, that the government had vetted this witness. And it suggests to the jury that the government was aware of no alibi evidence. And as your honors know, alibi is a loaded issue. The question is what do these comments do with respect to violating fundamental principles in our criminal justice system, which is that the burden of proof must be squarely on the government. The defendants have no obligation to present evidence to rebut any claims of the government's witnesses. And it needs to be free from speculation and evidence in the case. These comments directly implicated both of those principles. And I'm sorry, I can't see the clock for some reason. You have a minute left. Thank you. So, moving into the second issue, which is the denigration of the defense, coupled with the comments as to the lack of alibi, there are the comments with respect to defense counsels on the lack of evidence to support some of the critical claims that the government made with respect to why Ashanti was credible. Specifically, Ashanti had claimed that he falsely placed Mr. Sutherland in this homicide because purportedly he had a reach into the police department database and his mother's address would be located that way. And he was fearful of it. The government had the opportunity to put on competent evidence, non-hearsay evidence, to establish that theory, but it did not. And in the light of that, defense counsel objected. And in rebuttal arguments, the government then suggests that they do have additional evidence, but the defense counsel is essentially hiding the ball. This is impermissible and we would suggest reversible. Thank you very much. You reserve two minutes of rebuttal, Ms. Barber. We'll hear from the government. Good morning, Your Honors. Good morning. Jocelyn, may it please the court. My name is Jocelyn Courtney-Gonzalez and I represent the United States on this appeal. After an approximately two-week trial during which the government presented not only the testimony of Jesus Ashanti, but extensive corroborating evidence in the form of cell site evidence, call detail records, forensic evidence like DNA evidence and ballistic evidence, the defendants were properly convicted on all three counts charged in the indictment. Chief Judge Underhill also properly reviewed their challenges post-trial and denied them. His reasoning was sound and the law was correctly applied. And he similarly appropriately rejected the claims for requests for a new trial in this matter under Rule 33. So I'd like to begin with what all three counsel have touched on, which is the I alluded to this earlier, but this was not a one defendant case. Jesus Ashanti pled guilty to a crime that he himself admitted to having committed. His inconsistencies were brought out throughout the trial. The jury was able to observe him over the course of those two days of trial and ultimately deemed him credible, at least as to the essential aspects of his testimony. But again, there was corroborating evidence. The way that he described the path of travel and the way that the events occurred was corroborated by cell site evidence. The people that he described calling to arrange the robbery was corroborated by call detail records. He said that the robbery, murder and kidnapping was committed by Terrell Hunter himself, Harold Cook and Duran Mickens. And Duran Mickens DNA and Terrell Hunter's DNA and his own DNA matched or could not be eliminated from DNA evidence that was found at the crime scene. There was no reviewed forensic evidence in the case, and yet he knew that a 380 firearm was used. The way that he described the shooting occurring in the car was consistent with the fact of the soot, that the shooting was within a small distance. So all of these different strands of evidence could have been viewed by the jury as a way to corroborate the testimony of Jesus Ashanti. Let me ask you a question, if I could, about the DNA evidence, which seemed to me far less probative than we ordinarily think of when we think of DNA evidence. It's not as though there was a match here. There was a variety of statistical probabilities that someone was or wasn't in a group of people whose DNA would be generally associated with the profile found on material in the car. And so it seems significantly less probative to me than you just presented actually. You corrected yourself and said they couldn't be eliminated. But that was really not very strong evidence. There was no actual match ever found. Your Honor, there was no actual match. I mean, a couple of responses to that. One, that DNA evidence was from testing initially in 2009, 2011, and 2015. And it's certainly the case of the changes, and this came out at trial, that the lab has so I believe that in the time when this DNA evidence was being reported out, they reported out at much lower numbers. We're talking about that none of the defendants could be eliminated from the DNA, but thousands and thousands and thousands of other people also were consistent. It's like saying that they had type O blood or type A blood. I mean, it was really not very specific. Isn't that right? Because here, the rest of the evidence is generally corroborative of Ashanti's testimony about where Mr. Teasley was taken and so on. And the recantation concerned who actually did the shooting. We don't have very strong evidence placing these particular individuals in the car at the murder site, do we? Well, Your Honor, a lot of the DNA in this case was mixtures, which means they didn't have complete profiles. So the ability to report out at a level of included was not, it's more to get to the partial profile as opposed to it being a weaker DNA result. Now, as for Terrell Hunter, he's reported it cannot be eliminated in 9.1 million, which is the highest rate based on the profile they had that they would report out. It's true that Jaron Mickens is less than one, I think it's one in 2,900. I spent a lot of time trying to learn this too. That means that every 9.1 million people, only one would potentially, everyone else would be excluded out of every 9.1 million people except for one person? Is that the way that should work? Who could not be eliminated, yes. So, and then I think it's just important, I mean, the places where the DNA evidence is found is also important. I mean, Jaron Mickens, according to Ashanti, is... I'm sorry, just a second. Before you go on, could you just go through for each defendant what the statistic was? Yes, Your Honor. So for Jaron Mickens, it was one in 2,900. And then for Jesus Ashanti, I believe it was for... So he has DNA found on Charles Teasley's genes and I believe it is approximately one in 2,500 and then one in 6,300 are the reporting for cannot be eliminated. I mean, also importantly, every single piece of evidence is tested against Sinke Sutherland, who is eliminated from all pieces of evidence. He's not, cannot be eliminated at any ratio. But in any event, I mean, the DNA evidence combined with all of this other evidence, combined with Jesus Ashanti's credible testimony on the stand was enough evidence for the jury to convict and this family. Did you point to some evidence that they say is impossible? I think the one I would pick, it would be the carving out of his eye, which it seems couldn't have happened based upon the autopsy, right? So... Your Honor, the medical examiner, as we pointed to in redirect, testified that it was basically highly improbable, but possible that the bruising could have occurred in the same place. And he said that he didn't, he wasn't an expert on the effect of the clothing. But I think it's Your Honor, when you were questioning, one of the earlier defendants pointed out under the standard of U.S., United States v. O'Connor, the other cases on this, even if the jury did not believe him in certain aspects, so long as they found the rest of his testimony to be credible, that would be sufficient. So say the jury found that he was exaggerating on the torture, if they believed him in the other essential aspects of his testimony, that would be sufficient. To go to the arguments that were raised by defense counsel thus far, so beginning with Jerron Micken's argument that the district court improperly curtailed the closing, I think Your Honor, when questioning Attorney McGuire got at some of the points that I would have raised, but I would just like to say that each of the defense counsel, first of all, throughout the trial, the main tenant of defense counsel's claim was that this investigation was shoddy, we didn't do what we were supposed to do, it was not done in the way it should have been done, and each defense counsel had approximately 45 minutes for closing, Harold Cook's counsel went first, and for 45 minutes, the closing arguments were that Jesus Ashanti is a liar, and the government didn't do what it was supposed to do in its investigation. Jerron Micken's counsel? The district court's reason for not allowing them to elaborate on the Jamaicans was that there's no evidence in the record to make that argument from, but Mr. McGuire, in his reply brief, pointed to several pages of testimony that he, you know, there's a Jamaican accent that was referenced to point to a house of the Jamaicans who they had robbed earlier, so, you know, there were some pieces of evidence that would suggest that, right? Your Honor, there were some pieces, I mean, the evidence about the Jamaicans was that Charles Teasley had committed a robbery with Desmond Wright of a group of Jamaicans, and that they knew that he'd committed that robbery, and that robbery had occurred like approximately four months before he was killed and murdered. And then Kimberly Brooklyn said that the person who went to her door had a Jamaican accent. That's it. I mean, there was no specific evidence that linked the Jamaicans to this crime. But that's a pretty basic argument in trial by defense lawyers to say, look, he had a lot of enemies. One of the enemies that he had were these people he robbed four months ago. They were Jamaican, and it was somewhere in the Jamaican accent. I think that's a pretty standard defense argument, right? Well, Your Honor, as I think you yourself said earlier, I mean, Jerron Micken's counsel made this argument. It wasn't stricken. The district court, in its assessment of the case and its view of the case, felt that it was arguing from facts not in the record. But in any event, even if the district court was wrong on this, you just cannot establish the prejudice required for a new trial in light of the hours of argument about how the government improperly conducted its investigation in this case. The limited extra being able to say several more sentences about the Jamaicans and Desmond Wright, precluding that does not rise to the level of the prejudice that would be required for granting a new trial here. On the claims of prosecutorial misconduct, with regards to the statements by the government counsel about the alibi evidence, those statements were made as a commentary on the credibility of Jesus Ashanti. That is how the district court, who was listening to government counsel's arguments, construed them. When the objection was raised, the district court found that those arguments were proper. And then to the extent that there's a continuing challenge that government counsel went back to the same point in rebuttal, that was prefaced by saying that the government always carries the burden, and then ultimately the statement was withdrawn. And as the district court, I think, makes a good point in the opinion in which it denies defense challenge on this issue. I think there's six times that the district court finds that in its instruction, in its jury charge, it tells the jury that the burden rests always on the government. So it just can't be construed here again as rising to the prejudice that would require granting a new trial. I think for the reasons that were again pointed out on the questioning, the characterization of Special Agent James' testimony as vouching is not the case. As the district court found, he was commenting on the steps that his defense took. He was not commenting on evidence that was not presented before the jury. And so it's not the type of vouching that's been held to be improper in cases like United States v. Perez. As for Attorney Barber's comment on the denigration of the defense with regards to this commentary by government counsel during rebuttal summation about how defense counsel had objected to letting in further testimony about Kimberly Wolton, the background of that is that Harold Cook's counsel on closing spent a long time in the theme of how the government didn't do a good job on the investigation, explaining how this evidence as to Kimberly Wolton as to her involvement. Government counsel, after Harold Cook counsel's finished, stood up and said that the argument was improper and told the district court judge that it intended to comment on rebuttal that the evidence did not come in because it was objected to. The district court said that was fine. Defense counsel had no objection at that point. And then government counsel proceeded to rebuttal and made that exact comment. I think, again, as the district court found this was a proper commentary on the evidence, it goes to what was essentially, as the district court said several times, a peripheral issue in the case. And again, it doesn't meet the level of prejudice required for granting a new trial. I think those were the main arguments that have been discussed in the... Can I just ask you regarding the prosecutorial misconduct claims, can you clarify whether Ashanti or the government initiated the April 25, 2011 meeting at which Ashanti recanted his prior statement regarding Sutherland? No notes were made. Why did the government fail to correct the record when Agent Oldenburg testified that the meeting was set up so that Ashanti could recant? We don't know whether it was the government which set it up because they had found possibly evidence that Ashanti made a misstatement or whether it was Ashanti who requested the meeting. Wasn't it an obligation of the government to clarify that issue? Your Honor, the question was posed as to what Special Agent Oldenburg's memory of the meeting was. And his memory was that it was set up and that Ashanti voluntarily came forward to recant. There was some evidence, there was a lot of pre-trial briefing on this. There was some evidence that one of the assistants who didn't try the case in our district recalled that he had wanted to ask something of Ashanti and called the meeting. He didn't recall what he wanted to ask Ashanti. And that was the only evidence at all that there was anyone other than Ashanti who had called the meeting. And Ashanti's memory was that he wanted to recant as to sink a Sutherland. And again, so when Special Agent Oldenburg was asked that, he was testifying as to his memory. And there was no confirmation of what occurred. So I think that that, and again, I mean, Defense Counsel brought out exhaustively on cross-examination of him and of Ashanti, the fact of the lost notes, who initiated the meeting, etc. So to just touch briefly on the issue of the lost notes, I think as we laid out in our brief, first there's, Special Agent Oldenburg testified that he did keep notes, although there is no requirement under the case law to do so. He disclosed the recantation as to sink a Sutherland and DNA affidavits submitted two days after this meeting. And this evidence was available to Defense Counsel prior to the trial. It was used a lot by Defense Counsel during the trial. They opened on the idea of lost notes. They closed on that idea. During the trial, Judge Underhill required the government to have Special Agent Oldenburg actually produce a report from his recollection of the meeting, which he did. That was provided to Defense Counsel in advance of their questioning of Jesus Ashanti so that they would know everything that Special Agent Oldenburg could testify to. So this idea that's continuously presented in the Defense Counsel's briefs, that these notes, having these notes would have somehow tipped the balance when they were able to make so much of the lost notes when they knew. So Jesus Ashanti came in for three proffers before he recanted. And then I think five proffers after. They knew exactly the ways in which his story had changed. It wasn't as if they just had the three proffers and then nothing after that. And they were able to use those inconsistencies very effectively throughout the trial. I believe there was a second allegation that a further Brady violation occurred when the government failed to disclose annotated notes that did exist regarding an incident on the night of the kidnapping. Do those notes exist? Was the government obligated to disclose that information? Your Honor, there were. So when Special Agent James was testifying, he had notes that were disclosed to Defense Counsel at the time. They should have been disclosed earlier. Defense Counsel was granted the opportunity to recall Special Agent James and ask about the notes. From my recollection, they were just annotated comments on the phone numbers that were called. It's not like notes of a proffer session. But in any event, the Defense Counsel was granted the opportunity to recall him as a witness. They decided not to do so. And again, the district court judge who was there, who watched what happened, who saw the evidence come in, did not deem this to be a Brady violation or anything that would warrant a new trial on this basis. I'd like to touch briefly on the because I just there's just in case just to finish the point on the Brady violation. Defense Counsel asked for an adverse inference with regards to the lost notes in the reports that was properly denied by the district court. In Attorney McGuire's briefing on this subject, he suggests that the proper standard for an adverse inference instruction is negligence as opposed to gross negligence. I think that what is important is in the district court's opinion, it's clear that he knows the proper standard. He cites to that residential funding case and the Chin case. He cites the proper standard and he finds that Special Agent Oldenburg's actions did not rise to the level of a culpable state of mind, thus warranting such an instruction. And because he's correctly citing the law, because he sat through the trial, his decision on that should be reviewed for abuse of discretion in this matter. So I think just to conclude, unless your honors have further specific questions, I would just say... On the issue of establishing robbery of drug proceeds, I was baffled by the argument that if you bring $1,000 to a drug deal, that that's drug proceeds. I've never seen that before, that a buyer of drugs showing up if you rob the buyer of that $1,000, that's drug proceeds. Is there any case that stands for that? I know there was the SAFE. The SAFE would have been an independent basis to establish that they were trying to get the drug proceeds from the SAFE, but I think both the government and the district court made reference to the $1,000 that was going to be purchased money, which I think the evidence was taking from a female individual's purse. So can you comment on that? Yes, your honor. I mean, I think the district court looked at the precedent set by United States v. Taylor and United States v. Lee, which basically say that the effect is minimal and if the defendants intended to target a drug dealer for drug proceeds, they've affected interstate commerce. And the district court's reasoning was that the defendants... I don't think anybody refers to a purchaser of drugs as drug proceeds, right? Have you ever heard that before? Someone shows up to purchase came from another drug deal and then there was a proceed, but we don't have that here. We kept it coming from a female individual. Yeah, and the district court's reasoning on that was that the defendants stole that money seconds before a drug transaction was about to be consummated. So, but for the interruption of the defendants, that money would be drug proceeds. But again, as your honor stated, I mean, the evidence that they stole this... That would mean if you rob a bank and then you take the money from the bank to purchase drugs that someone robs you before you get to the drug deal, those are drug proceeds? I mean, your honor, I think you have two ways to uphold this conviction. The other way is on the safe. Okay, thank you. Thank you. So if your honors have no further questions, I would just end by saying that in this case, you have a district court who laid out the law correctly, had a well-reasoned opinion in which he correctly applies the law on all of these issues, and his opinion and the convictions of the defendants should be affirmed. Thank you. Thank you very much. We'll hear rebuttal then. Mr. McGuire. Thank you. Very briefly with respect to the issue of closing argument, I think Judge Bianco and the government both noted that the court didn't strike what defense counsel had managed to start saying. That said, I think that the court cut off of defense counsel, and defense counsel then moving on to a different topic sent a very clear message about essentially telling the jury this was not a correct direction. And again, many of the facts that are outlined in our brief were not able to be elucidated. Also, I do want to touch on this issue of the Brady violation and these lost notes. The government has said there's no obligation to keep notes. And as are set forth in our written submission, that's really unclear. I think the courts have very carefully said we aren't reaching the question of whether in the case of clear Brady material, whether there may be an obligation to record that, memorialize that in a concrete way. And I think this case really is the poster child, really cautionary tale why that courts haven't said there's no obligation. Excuse me, so you're asking us to make a bright line rule on this, which does not yet exist in the Second Circuit regarding taking and keeping and safeguarding notes of this nature. Is that right? I think that a bright line rule would be very salutary and very appropriate. I think it would help avoid what happened here, which is a scenario that I imagine Agent Alden very much regrets. Maybe it's sort of a teaching moment for agents. Hold on a second. There is a bright line rule that you don't have to do that except in some potentially extraordinary circumstance, which we've left open. That's the current law. That's correct. There's no obligation, except Rodriguez has acknowledged that that excludes Brady material. And so it's a rule for non-Brady material. And here the problem is, again, we have a situation where there is clear Brady material and a future obligation to disclose it to defense counsel. But that obligation can't be satisfied in the moment. There is no case. And so now, many more than eight years later, we're in a situation where normally the remedy for a Brady violation is you give defense counsel the material. There can be a new trial. Here, there's really no way to perfectly remedy the Brady violation. The information is gone. It's lost. But in this case, the recantation was memorialized in an affidavit soon after Mr. Ashanti recanted. So the information was made available in a timely way to the defense, was it not? So some information was. The bare fact that Jesus Ashanti fundamentally changed his story was briefly memorialized in the document. The question that remains is what else was said in this meeting where it's a little unclear exactly when the meeting was, exactly how long it lasted. Agent Aldenberg acknowledged there were additional questions to Ashanti about, essentially, what else did you lie about? And so we're in a situation where we don't have precisely what that information was. And the governments can't possibly fix that. And so there's both the Brady problem, but also in terms of the question of what is a remedy. This is why the defense has asked for and why we believe an instruction with respect to an adverse inference would have at least taken an important step towards addressing the problem. The government had information. The government lost information. As we've said forth, and I think the government agrees, the standard is simply negligence, at least in some circumstances. And as a remedy to try to put the defense back on the footing it might have been on. An adverse inference would have been certainly appropriate. I think there's a question of whether it would have been sufficient. The district judge didn't even do that. Thank you very much. We'll hear from Mr. Donovan. At the end of my argument, Judge Garalfas and I were discussing one aspect of the case and there's a certain twist to that aspect that I think is really quite disturbing. Remember Ashanti said that the reason he falsely accused an innocent man was because the innocent man's girlfriend or wife was a dispatcher at the Hartford Police Department and she could find out where he lived. During the course of the questioning of Agent James, the government sought to get James to testify as to what he had heard from the Hartford Police Department about their dispatchers improperly using identification tools. We objected that that was hearsay. The objection was sustained. And then in final argument, we argued that there was no evidence whatsoever as to any improper use of locating tools by Hartford Police dispatchers. And then the prosecutor argued the only reason that that happened, the only reason there was no evidence about that was because the defense had objected and kept it out. Now the reason there wasn't any evidence was because the government chose not to bring in anybody from the Hartford Police Department. It was a long trial and they probably decided it was distracting. But this is really disturbing. I mean the only reason that we didn't disclose the drugs in the defendant's house was because the defense moved to suppress it and succeeded because there was no warrant. The only reason that we didn't introduce evidence that the defendant was there was because his confession was suppressed and the defense kept it out. And the disturbing thing is that the district judge says it was perfectly proper for the defense to argue that there was no evidence of this and it was perfectly proper for the government to argue that there was no evidence of it because the defendants objected and kept it out. This is disturbing and I hope your honors will consider it. And for all those reasons and all the reasons that my co-defendants have indicated, I hope you'll reverse the conviction. Thank you very much. Ms. Barber. Yes, thank you. Just briefly, I want to touch on a few issues. With respect to the government's claim that the court's instructions mitigated the error in this case, the cases that we've cited, United States v. Cruz and the case that the government cites, United States v. Parker, make clear that in instances where there is burden shifting, an instruction specifically directed at that conduct is appropriate and may serve to alleviate that error. That was not done here. And I would also add that the court also expressly instructed the jury that counsel's arguments could be used in evaluating the evidence in the case. To build on what Attorney Donovan was saying with respect to disparaging defense counsel, I think it's important to just nail home that these arguments suggest that defense counsel is withholding information from the jury. That strongly or severely prejudiced the defendants by causing the jury to believe that defense counsel's characterization of all of the evidence in the case cannot be taken seriously. And also I would add flies in the face of instructions that are routinely given that juries cannot draw any adverse inferences from objections that are made in the case. With respect to the government's argument that the Sutherland recantation and the reason for it is peripheral to the case, I strongly disagree. This was a one witness case against Mr. Cook. Nothing that pertained to Ashanti's testimony was the only evidence against him. And for that reason the misconduct which was directed at shoring up his testimony tilted the balance here in terms of Mr. Cook receiving a fair trial. We would ask the conviction to be reversed. Thank you. Thank you very much. Thank you all very well argued. We'll take the matter under advisement. That concludes our oral argument calendar for today. We have three cases on page 73, Ben v. Garland. Number 19, 1139 U.S. v. Mercedes. And number 1034, Tonina v. Connecticut Department of Revenue. And we will reserve decision on those cases as well. The clerk will please adjourn court. Court is adjourned.